NATIONAL BANK OF NORTH AMERICA, Respondent, v INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS LOCAL NO. 3, PENSION AND VACATION FUNDS, Respondent, and JOINT INDUSTRY BOARD OF THE ELECTRICAL INDUSTRY, Appellant.

Second Department, August 6, 1979

* By the Publisher's Editorial Staff.

### APPEARANCES OF COUNSEL

*Cole & Deitz (Andrea Catania, Edward N. Meyer* and *Joseph Di Benedetto* of counsel), for National Bank of North America, respondent.

*Donald F. Menagh (Norman Rothfeld* of counsel), for appellant.

### OPINION OF THE COURT

*Per Curiam.*

The basic issue on appeal is whether the vested benefits payable to a judgment debtor from an employee pension fund governed by the Federal Employment Retirement Income Security Act of 1974 (ERISA) (US Code, tit 29, § 1001 *et seq.)* are exempt from the New York statutory procedures governing enforcement of money judgments (see, generally, CPLR art 52). We believe that the statutory rights of a judgment creditor, including the mechanisms of levy and garnishment, are neither in conflict with nor pre-empted by the provisions of ERISA and, therefore, such vested benefits are not exempt.

### I

On June 30, 1969, the petitioner, National Bank of North America (the Bank), obtained a money judgment against Martin Conlon in the sum of $1,478.10. Conlon is a retired pensioner of the International Brotherhood of Electrical Workers, Local No. 3, and is entitled to receive monthly payments of $325 from an electrical industry sponsored annuity fund and $159 from an electrical industry pension, hospi-

talization and benefit fund. These funds are administered by the appellant, the Joint Industry Board of the Electrical Industry (the Board), pursuant to collective bargaining agreements between electrical contractors and the union. In an effort to collect the unsatisfied judgment,* the Bank commenced the instant proceeding to levy upon the vested benefits held by the Board for payment to Conlon.

The Board resisted the petition on the general ground that the benefit plans are wholly governed by ERISA and are, therefore, not subject to State mechanisms for enforcing money judgments. Special Term rejected the Board's analysis and directed, *inter alia,* that in accordance with CPLR 5205 (subd [d]), the Board pay to the Bank from the vested benefits of the annuity and disability funds payable to Conlon, an amount equal to 10% of said payments as they become due until the Bank's judgment is satisfied.

## II

On appeal, the Board relies on two separate sections of ERISA for the proposition that ERISA-governed pension plans are not subject to the judgment enforcement mechanisms of CPLR article 52. It is first argued that ERISA generally preempts all State statutes which affect the regulation of pension plans. Reference is made to subdivision (a) of section 1144 of title 29 of the United States Code (ERISA, § 514, subd [a]), which provides:

"Supersedure; effective date

"(a) Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State Laws insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title. This section shall take effect on January 1, 1975."

The Board next argues that regardless of the general preemption resulting from the above supersedure section, the remedies of garnishment, levy, etc., are expressly prohibited

---

* Prior to the issuance of this decision, but after oral argument, we were informed by the petitioner that the judgment debtor has discharged his debt. It is our view that the appeal should not be dismissed as moot since it involves a question of general interest and substantial public importance and is likely to recur (see *Matter of Gannett Co. v De Pasquale,* 42 NY2d 370; *Matter of Jones v Berman,* 37 NY2d 42). We have therefore elected to proceed with the issuance of this decision.

by subdivision (d) of section 206 of ERISA (US Code, tit 29, § 1056, subd [d]) which provides:

"Assignment or alienation of plan benefits

"(d)(1) Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

"(2) For the purposes of paragraph (1) of this subsection, there shall not be taken into account any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment, or of any irrevocable assignment or alienation of benefits executed before September 2, 1974. The preceding sentence shall not apply to any assignment or alienation made for the purposes of defraying plan administration costs. For purposes of this paragraph a loan made to a participant or beneficiary shall not be treated as an assignment or alienation if such loan is secured by the participant's accrued nonforfeitable benefit and is exempt from the tax imposed by section 4975 of Title 26 (relating to tax on prohibited transactions) by reason of section 4975(d)(1) of Title 26."

The Board notes that the Internal Revenue Code has been similarly amended to require that a trust plan must provide that benefits may not be assigned or alienated for purposes of qualifying for the tax advantages available to such plans (US Code, tit 26, § 401, subd [a], par [13]).

. Allegedly in accordance with the above antialienation clause, the plans administered By the board provide that the benefits payable to beneficiaries "cannot be assigned and shall not be liable to attachment, garnishment or other process and shall not be taken, appropriated or applied by legal or equitable process, or by operation of law, to pay any debt or liability" of the beneficiary.

The application of the above supersedure and antialienation sections is largely dependent upon the congressional intent in drafting these sections. Pertinent to this determination of legislative intent is the congressional statement of findings which led to the adoption of ERISA and declares the policy of the act as follows (US Code, tit 29, § 1001):

"(a) The Congress finds that the growth in size, scope, and numbers of employee benefit plans in recent years has been rapid and substantial; that the operational scope and economic impact of such plans is increasingly interstate; that the continued well-being and security of millions of employees and their dependents are directly affected by these plans; that

they are affected with a national public interest; that they have become an important factor affecting the stability of employment and the successful development of industrial relations * * * that it is therefore desirable in the interests of employees and their beneficiaries, for the protection of the revenue of the United States, and to provide for the free flow of commerce, that minimum standards be provided assuring the equitable character of such plans and their financial soundness.

"(b) It is hereby declared to be the policy of this Act to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries * * * by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts."

### III

Our analysis of the purposes of ERISA and the purposes of CPLR article 52 leads to the conclusion that there is no absolute pre-emption of our State's procedures for enforcing a money judgment by application of ERISA's supersedure clause (US Code, tit 29, § 1144, subd [a]). At the outset we emphasize that the purposes of CPLR article 52 are wholly unrelated to the purposes of ERISA. Rather than seeking to affect the administration or regulation of employee benefit plans, CPLR article 52 is concerned with the fundamental problem of enforcing money judgments. Such mechanisms are absolutely essential to insure the integrity of our courts' judgments and without such procedures judicial redress would be frequently no more than an empty gesture. By allowing the instant exercise of judicial enforcement, there is no risk that an innocent person will be deprived of the financial security which he justly deserves after a lifetime of labor. Nor is there the risk that by enforcing the instant judgment Conlon will be reduced to poverty.

To the extent that the State enforcement procedures allow execution on pension benefits, the amount to be garnished is expressly limited to 10% of the total benefit payments which are to be made to the judgment debtor. CPLR 5205 provides:

"(c) Trust exemption. Any property while held in trust for a judgment debtor, where the trust has been created by, or the fund so held in trust has proceeded from, a person other than

the judgment debtor, is exempt from application to the satisfaction of a money judgment.

"(d) Income exemptions. The following personal property is exempt from application to the satisfaction of a money judgment, except such part as a court determines to be unnecessary for the reasonable requirements of the judgment debtor and his dependents:

"1. ninety per cent of the income or other payments from a trust the principal of which is exempt under [subdivision (c)]".

It is noteworthy that the 10% limitation on garnishment coincides with the allowance of voluntary revocable assignments not to exceed 10% which are authorized by section 206 (subd [d], par [2]) of ERISA (US Code, tit 29, § 1056, subd [d], par [2]).

The congressional purpose in adopting ERISA was to provide minimum standards "assuring the equitable character of such plans and their financial soundness" (US Code, tit 29, § 1001, subd [a]). The policy of the act was further declared to be to protect "the interests of participants in employee benefit plans and their beneficiaries * * * by establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans, and by providing for appropriate remedies, sanctions, and ready access to the Federal courts" (§ 1001, subd [b]). It is clear from the foregoing and from an examination of the history of ERISA that its purpose was to protect the beneficiaries of the funds from mismanagement of those funds by the fiduciaries of the plans. By enacting ERISA Congress sought to correct the pattern of wasting and looting which had resulted in a devastating denial of benefits to the intended recipients of the plans. Thus, in *Wayne Chem. v Columbus Agency Serv. Corp.* (426 F Supp 316, 322), the United States District Court declared: "By its terms, of course, ERISA does not control what might be termed 'beneficial rights' under an employee benefit plan. Rather, ERISA specifically addresses national problems which have arisen in the past with respect to the vesting, funding, and administration of these plans. ERISA, as implemented, imposes broad financial disclosure and other requirements upon those responsible for maintaining pension and other funds for the benefit of the American worker. * * * Congress found also that, due to mismanagement, 'employees and their beneficiaries have been deprived of anticipated benefits.' * * * Congress set forth

these concerns, of course, with an eye to the specific issues of vesting and funding regulated by the statute."

Here appellant makes no claim that its compliance with CPLR 5205 would in any way endanger the financial security of the fund or adversely affect its administration of the fund to the detriment of the beneficiaries. Nor is it suggested that such funds would be exempt from enforcement mechanisms in the absence of ERISA (cf. *Laborers Union Local 1298 v Lyon & Sons,* 66 Misc 2d 1042). Rather, appellant simply makes the sweeping claim that its compliance with CPLR 5205 invades the immunity supposedly given to it by Federal law from any regulation by the States. However, in the absence of a substantive intrusion, the pre-emption provision must be read in light of the purposes of ERISA and there is nothing in either the congressional declaration or in ERISA's legislative history which suggests any such absolute exemption from all State statutes.

A State statute will be pre-empted only when it tends to invade an aspect of the regulation of pension funds that is governed by ERISA as established in the Federal act. However, New York's vital interest in assuring the enforceability of our courts' judgments is wholly peripheral to the purposes of ERISA (cf. *General Motors Corp. v Townsend,* US Dist Ct, ED Mich, Civ No. 6-72159, Dec. 16, 1976; *American Tel. & Tel. Co. v Merry,* 592 F2d 118). CPLR article 52 makes no attempt to regulate pension plans and presents no cognizable encroachment upon the exclusive province of ERISA regulation. Therefore, the supersedure provision is not applicable to the enforcement of money judgments.

The peripheral nature of State procedures for enforcing commercial judgments, insofar as their impact on ERISA is concerned, is further indicated by the recent decision in *National Bank of North Amer. v Local 553 Pension Fund of Int. Brotherhood of Teamsters & Chauffeurs* (US Dist Ct, ED NY, No. 78C758, Dec. 28, 1978). That case involved a similar action by the petitioner against a beneficiary of a local union pension fund seeking partial recoupment from pension payments made by the fund under CPLR 5225 (subd [b]) in satisfaction of a 1975 judgment held against the beneficiary by the bank. The court held that no Federal question was raised and denied a motion by the pension fund to transfer the action from State court to Federal court. In so doing, the court stated that the bank's claim derived entirely from State,

rather than Federal law, and that the relief sought, an order directing the fund to pay to the bank a portion of the monthly pension benefits payable to the judgment debtor beneficiary, was "purely a creation of New York law", thereby rejecting the fund's effort to characterize the proceeding as an action brought to clarify a pensioner's right to future benefits from a plan subject to ERISA's substantive provisions and further rejecting the concept that such proceeding is one within the Federal court's subject matter jurisdiction and calling for a Federally created remedy.

## IV

Having concluded that the application of State procedures for enforcing a money judgment are not pre-empted by the supersedure section (US Code, tit 29, § 1144, subd [a]), we also conclude that the express prohibition of assignments and alienations (US Code, tit 29, § 1056, subd [d]) was not intended to bar the enforcement of money judgments by application of legal process, such as garnishment. This conclusion is founded upon the fact that when Congress wished to exempt certain kinds of benefits from execution or levy, it has so stated in no uncertain terms. With respect to the protection of Social Security benefits, Congress declared not simply that they were to be immune from alienation or assignment, but that: "The right of any person to any future payment under this subchapter shall not be transferable or assignable, at law or in equity, and *none of the moneys paid or payable or rights existing under this subchapter shall be subject to execution, levy, attachment, garnishment, or other legal process, or to the operation of any bankruptcy or insolvency law"* (US Code, tit 42, § 407; emphasis supplied).

With respect to the protection of Railroad Retirement Act benefits, Congress declared: "Notwithstanding any other law of the United States, or of any State, territory, or the District of Columbia, *no annuity* or supplemental annuity *shall · be assignable or be subject to any tax or to garnishment, attachment, or other legal process under any circumstances whatsoever,* nor shall the payment thereof be anticipated" (US Code, tit 45, § 231m; emphasis supplied).

With respect to veterans' payments made under Federal law, Congress declared: "Payments of benefits due or to become due under any law administered by the Veterans' Administration shall not be assignable except to the extent ·

specifically authorized by law, and such *payments* made to, or on account of, a beneficiary *shall be exempt from taxation, shall be exempt from the claim of creditors, and shall not be liable to attachment, levy, or seizure by or under any legal or equitable process whatever, either before or after receipt by the beneficiary"* (US Code, tit 38, § 3101, subd [a]; emphasis supplied).

The difference in language between the statutes governing Social Security, railroad retirement and veterans' benefits from that used with respect to ERISA benefits is of the utmost importance and, in view of the comprehensive nature of ERISA, the failure to expressly prohibit garnishments, etc., may not be disregarded as a mere legislative oversight.

A prohibition of attachment, levy, garnishment or other legal process has a specific meaning and legal implication wholly different from language which merely prohibits assignments and alienations. The differences are highlighted by the phrase "legal process". Unlike an assignment or general alienation, garnishment, levy and other legal processes are remedies which generally arise after an adjudication of liability and the exercise of these remedies is subject to judicial supervision. Whereas assignment and alienation are generally voluntary arrangements between individuals, garnishment and levy are exercises of State power which result in involuntary transfers. Thus, there is little risk that a guileless and innocent pensioner will be defrauded of his benefits by either the actions of those administering the fund or of a third party. Nor is there a risk that the intended beneficiary will not receive the vast majority of the payable benefits. Furthermore, those benefits which pensioners forego by operation of CPLR article 52, nevertheless inure to the employee's benefit by reducing an adjudicated liability. In view of the legislative statement of purposes, it is clear that ERISA's antialienation provision is directed at the unsupervised and highly detrimental transfers by which pensioners had been victimized prior to the enactment of ERISA. No such result would occur by allowing the judicially supervised enforcement of a money judgment.

Further evidence that Congress did not intend its ban on assignment or alienation of benefits to include any garnishment or levy on the benefits payable to ERISA pensioners appears in the House Conference Report on ERISA, which states that "a garnishment or levy is not to be considered a

voluntary assignment" under subdivision (d) of section 206 (House Conference Rep No. 93-1280, 93d Congress, 2d Session, US Code, Cong & Admin News, 1974, p 5061).

The basic nature of ERISA also supports the conclusion that State enforcement remedies were not intended to be prohibited. Whereas Social Security, railroad retirement and veterans' benefits are specially created government programs, ERISA is a more pervasive regulatory system which reaches wholly private funds affecting privately negotiated benefits of millions of persons. Such pension benefits are in the nature of deferred employee compensation and are generally a supplement to the old age and disability insurance benefits which the Social Security program was intended to secure for all workers. Construing these privately negotiated benefits as being exempt from the State enforcement of judgments would improperly create a haven for judgment debtors to avoid payment of their adjudicated liabilities.

In addition, several courts have determined that ERISA's antialienation provision does not bar garnishment of payable benefits in satisfaction of family support orders issued by a State court (see, e.g., *American Tel. & Tel. Co. v Merry,* 592 F2d 118, *supra; Cody v Riecker,* 594 F2d 314). Although the State's interest in assuring that a pensioner meets the familial obligations of support and maintenance is somewhat different from the State's interest in preserving the integrity of commercial judgments, both involve the same type of legal process rather than individual action and there is no distinction in how fulfillment of these legal obligations affects the administration and regulation of ERISA plans.

Upon the above analysis, we conclude that the enforcement remedies of CPLR article 52 do not conflict with the antialienation provision of ERISA. Nor are the enforcement mechanisms pre-empted by ERISA's provision that State statutes which seek to regulate employee benefit plans are superseded. Finally, we note that the language in the subject plans that seeks to exempt trust funds from the reach of judgment creditors is not enforceable (see *Matter of Sand v Beach,* 270 NY 281).

Accordingly, the judgment should be affirmed.

RABIN, J. (dissenting). I dissent and vote to reverse the judgment and dismiss the petition.

I believe that the statutory language that "[e]ach pension

plan shall provide that benefits provided under the plan may not be assigned or alienated" (US Code, tit 29, § 1056, subd [d], par [1]) was intended to include a prohibition of garnishment and other forms of legal process. In interpreting this section the majority has suggested that there is an intrinsic distinction between assignment and alienation on the one hand, and garnishment and other legal process on the other. The distinction is premised upon the recognition that assignments and alienations are generally voluntary transfers in which the transferor is an affirmative participant, whereas garnishments, etc., are involuntary transfers in which the transferor is a passive, if not unwilling, participant. However, this distinction ignores the common essence of transfers by assignment and transfers by garnishment, that being the element of a transfer. It is the practical consequences of a transfer of benefits away from the intended beneficiaries which the antialienation provision seeks to remedy. Whether that transfer is voluntary or involuntary in nature is of no significance.

The law has recognized that the terms "assignment" and "alienation" are broad enough to include involuntary transfers which occur by operation of law, as well as voluntary transfers. Whether involuntary transfers should be included in a general statutory proscription against assignment and alienation depends upon legislative intent (cf. *United States v Aetna Cas. & Sur. Co.,* 338 US 366). From this perspective, it seems plain that the general antialienation provision contained in ERISA was also intended to prohibit transfers occurring by operation of law, such as garnishments.

The underlying purpose of ERISA was to redress the history of fiduciary irresponsibility and misconduct that had resulted in the frequent dilution and complete loss of expected pension benefits to many thousands of persons. Thus, the statutory focus on issues of vesting, funding and fiduciary responsibility reflects the paramount concern that the expected benefits are fully and actually available to the intended beneficiary for retirement purposes (see House Rep No. 93-807, 93d Congress, 2d Session, US Code, Cong & Admin News, 1974, p 4734). Congress intended ERISA benefits to supplement Social Security benefits (US Code, tit 29, § 1056), thereby implicitly recognizing the plight of pensioners who generally must combat inflation on fixed incomes. Certainly, an involuntary diversion of intended benefits has the same detrimental effect of diluting a pensioner's available retirement income as does a volun-

tary transfer *(Cody v Riecker,* 454 F Supp 22, affd 594 F2d 314). Therefore, for the antialienation provision to be in furtherance of the legislative objective, it must apply to involuntary, as well as voluntary transfers.

The only available legislative history on this section of ERISA (US Code, tit 29, § 1056) is an interpretative comment by the Joint House and Senate Conference Committee which states in part (House Conference Rep No. 93-1280, 93d Congress, 2d Session, US Code, Cong & Admin News, 1974, p 5061): "Under the conference substitute, a plan must provide that benefits under the plan may not be assigned or alienated. However, the plan may provide that after a benefit is in pay status, there may be a voluntary revocable assignment (not to exceed 10 percent of any benefit payment) by an employee which is not for purposes of defraying the administrative costs of the plan. For purposes of this rule, a garnishment or levy is not to be considered a voluntary assignment."

The only reasonable interpretation of this language is that the committee included the final sentence (i.e., "For purposes of this rule, a garnishment or levy is not to be considered a voluntary assignment") in order to clarify and emphasize that garnishments, etc., were intended to be included in the general prohibition of assignments and alienations as distinguished from the language that allows a limited exception of a voluntary revocable assignment of not to exceed 10% of any benefit payment (see US Code, tit 29, § 1056, subd [d], par [2]). It is only in the sentence creating a limited exception to allow certain voluntary revocable assignments that there appears a distinction between voluntary and involuntary assignments. The more general terminology in the basic prohibition must therefore be deemed to include voluntary and involuntary transfers (see *General Motors Corp. v Townsend,* US Dist Ct, ED Mich, Civ No. 6-72159, Dec. 16, 1976; *General Motors Corp. v Buha,* US Dist Ct, AD Mich, Civ No. 7-72629, Feb. 22, 1978; *Cody v Riecker, supra).*

Significantly, the Internal Revenue Service has promulgated regulations which adopt the above interpretation. Thus, 26 CFR 1.401(a)-13 provides:

"(b) *No assignment or alienation.*

"(1) *General rule.* Under section 401(a)(13), a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under the plan may not be anticipated, assigned (either at law or in equity), alienated or

subject to attachment, garnishment, levy, execution or other legal or equitable process."

Since the Internal Revenue Service is jointly charged with the Department of Labor with administering ERISA, the interpretation adopted by that agency is of course entitled to great weight. This is particularly so in view of the failure of the Department of Labor to promulgate any regulation on this aspect of the statute, and because the antialienation provision has rather direct tax consequences (cf. Report by the House Ways and Means Committee [on ERISA], House Rep No. 93-807, 93d Congress, 2d Session, US Code, Cong & Admin News, 1974, p 4734).

Other than the *General Motors Corp. v Buha* case *(supra),* which holds that garnishments are prohibited by the statute, there are no other cases involving enforcement of a commercial creditor's money judgment. However, there are several cases involving enforcement of family support orders. These cases invariably (except for *General Motors Corp. v Townsend, supra,* which held that the antialienation clause prohibits all garnishments) allow garnishments for this limited purpose (see, e.g., *Cody v Riecker, supra; American Tel. & Tel. Co. v Merry,* 592 F2d 118, *supra; Cogollos v Cogollos,* 93 Misc 2d 406; *Matter of Wanamaker v Wanamaker,* 93 Misc 2d 784; *Cartledge v Miller,* 457 F Supp 1146). The thrust of these decisions is that enforcement of family support orders constitutes a special exception to the general antialienation provision, arising from the special status of the family support obligation and from the broad interpretation of beneficiary as including the pensioner's family. Significantly, none of these decisions suggest that garnishments per se are not prohibited and have implicitly indicated the contrary result (i.e., that garnishments per se are prohibited). The District Court opinion in *Cody v Riecker* (454 F Supp 22, *supra)* has expressly so stated. It is noted that these cases lend no support to the majority position because garnishments have also been allowed for purposes of enforcing family support orders against Social Security and railroad retirement benefits, despite the express prohibition of such legal process in those statutes (see, e.g., *Hisquierdo v Hisquierdo,* 439 US 572).

Based upon the above analysis, I am persuaded that the statutory language prohibiting the assignment or alienation of pension benefits should be given its full effect, to include transfers by operation of law, as well as voluntary transfers

(cf. *United States v Aetna Cas. & Sur. Co.,* 338 US 366, *supra).* Only in this way will the congressional purpose of insuring "that the employee's accrued benefits are actually available for *retirement* purposes" be fully achieved (see House Rep No. 93-807, 93d Congress, 2d Session, US Code, Cong & Admin News, 1974, p 4734; emphasis supplied).

MOLLEN, P. J., SUOZZI and MARTUSCELLO, JJ., concur in *Per Curiam* opinion; RABIN, J., dissents and votes to reverse the judgment and dismiss the proceeding, with an opinion.

Judgment of the Supreme Court, Nassau County, entered January 5, 1978, affirmed, without costs or disbursements.