COMMERCIAL MORTGAGE INSURANCE INC., Plaintiff,

v.

CITIZENS NATIONAL BANK OF DALLAS, Garnishee,

Alan Eberstein, M.D., Professional Association Employees' Profit Sharing Plan and Trust; Alan Eberstein, M.D., Professional Association Employees' Pension Plan and Trust; Alan Eberstein, M.D., Professional Association; and Alan Eberstein, Trustee Intervenors.

Civ. A. No. 3-80-0489-H.

United States District Court,
N. D. Texas,
Dallas Division.

Nov. 10, 1981.

Jim Lee, Winstead, McGuire, Sechrest & Trimble, Dallas, Tex., for plaintiff.

Patrick Stark, Baker, Riddle, Miller, Phillips, Brown & Murray, Dallas, Tex., for Garnishee.

Franklin H. Hytken, G. Tomas Rhodus, Rhodus, Jones & Hytken, Dallas, Tex., for intervenors.

## MEMORANDUM OPINION

SANDERS, District Judge.

On September 2, 1974, following almost a decade of study of private pension plans, Congress enacted the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, *et seq.* As the Supreme Court recently observed, ERISA is a "comprehensive and reticulated statute", *Nachman Corp. v. Pension Benefit Guaranty Corp.*, 446 U.S. 359, 361, 100 S.Ct. 1723, 1726, 64 L.Ed.2d 354 (1980), which was designed to protect "interstate commerce and the interests of participants in employee benefit plans and their beneficiaries ...." ERISA § 2(b), 29 U.S.C. § 1001(b). Finding "that the continued well-being and security of millions of employees and their dependents are directly affected by these plans ...." ERISA § 2(a), 29 U.S.C. § 1001(a), Congress prescribed a variety of requirements for pension plans, including participation and vesting standards, and established a complex regulatory scheme to effectuate the policies underlying the Act.

The Court is asked in the case *sub judice* to determine whether either the language or legislative intent of three provisions of ERISA operate to bar any garnishment under state law of pension benefits by a commercial creditor of a plan beneficiary. The construction of these particular sections of ERISA has yet to receive significant legal attention within the factual context presented by this controversy and presents a difficult question of both statutory interpretation and legislative history. The first section relevant to this inquiry is 29 U.S.C. § 1056(d)(1) which states that "[e]ach pension plan shall provide that benefits provided under the plan may not be assigned or alienated." ERISA § 206(d)(1). A provision almost identical to § 1056(d)(1) is found in the companion tax provisions to ERISA in the Internal Revenue Code wherein assignment or alienation of benefits is also prohibited if a pension plan is to be qualified for special tax benefits under the statute.[1] 26 U.S.C. § 401(a)(13). Another provision which bears on the present issue is section 1144(a) of the statute which provides that ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan ...." ERISA § 514(a). The interpretation and application of these provisions to the case at hand rests on the undisputed record before the Court which is set out below.

### A. Garnishment of Eberstein Pension Benefits

On July 13, 1979, a judgment for $255,-986.48 was entered in the United States District Court for the Northern District of Texas in favor of Plaintiff Commercial Mortgage Insurance (CMI) and jointly and severally against Dr. Alan Eberstein and others not presently involved in this case. *Commercial Mortgage Insurance Corporation v. Eberstein, et al.*, Civil Action No. 3–77–0532–D (N.D.Tex.1979). No superse-

---

1. Under ERISA, responsibility for administration and enforcement of the statute's substantive provisions is allocated between the Department of Labor and the Internal Revenue Service. The administration of the participation, vesting and funding standards is delegated to Labor and to IRS in the case of plans which seek tax qualification. In order to avoid duplication of effort, the statute delegated certain particular standards to one agency or the other. Since it was viewed as probable that almost all pension plans would seek tax qualification,

however, the basic enforcement responsibility for participation, vesting and funding, was given to the IRS. House & Senate Conf.Comm., Conf.Rep. on H.R. 2, Pension Reform, H.R.Rep. No.93–1280, 93d Cong., 2d Sess. 280 (1974), reprinted in [1974] U.S.Code Cong. & Admn. News 4639, 5038; Statement of Hon. Harrison Williams, Jr., Chairman, Senate Committee on Labor and Public Welfare, Upon Introducing the Conference Report on H.R. 2, reprinted in [1974] U.S.Code Cong. & Adm.News 5177, 5187–88.

deas bond was filed by any defendant pending appeal and the Fifth Circuit subsequently affirmed the judgment. Following post-judgment discovery, these garnishment actions were instituted against the Citizens National Bank and E. F. Hutton as garnishees to reach Dr. Eberstein's interests in accounts styled "Alan Eberstein, M.D.–P.A., Money Purchase Pension Plan" and "Alan Eberstein, M.D.–P.A. Profit Sharing Plan" and in other assets of the plans. The profit-sharing and pension plans and their trustee, Eberstein, have intervened herein to assert exemptions as to such funds under both ERISA and Texas law.[2]

Dr. Eberstein practices as a general surgeon and was one of the original shareholders of Alan Eberstein, M.D.–P.A. (the "Association"), a Texas Professional Association chartered under Tex.Rev.Civ.Stat.Ann. Art. 1528e on February 28, 1972. In April 1972, the Association adopted the pension and the profit-sharing plans based upon a prototype furnished by Republic National Bank, which was designated as trustee under both plans. The Internal Revenue Service notified both plans in May 1973 that they had been determined to be qualified under the then-applicable provisions of the Internal Revenue Code. The Association's board of directors, then consisting of Dr. Eberstein and Richard Martin, M.D., adopted a resolution in November 1974 which authorized and directed the removal of Republic as trustee of the plans and which named themselves as co-trustees.

After the enactment of ERISA in 1974, the two original Republic National Bank plans were superseded and replaced by plans drafted to conform to the new statute. Pursuant to the provisions of ERISA, 29 U.S.C. § 1056(d)(1) and 26 U.S.C. § 401(a)(13), both plans contained the following clause:

> Except insofar as may be contrary to any applicable laws, no participant shall have any power to assign, transfer, pledge, encumber or anticipate any interest in the trust or in any payments to be made thereunder and any attempts to do so shall be void; nor shall any such interest be in any manner subject to levy, attachment or other legal process to enforce payment of any claim against any participant; except that such prohibitions shall not be applicable to any loan made by the Plan to a participant of beneficiary, which is secured by the participants' vested accrued benefit and which is authorized in accordance with this Plan and Trust.

Pension Plan, ¶ 10.01, Profit Sharing Plan ¶ 10.01. Upon their adoption and at various times thereafter, the plans have received notification from the Internal Revenue Service that the plans were deemed qualified under Section 401 of the Internal Revenue Code. Since receipt of the last such letter in October 1977, nothing has occurred to revoke or modify the determination of the IRS.

Eberstein has been an employee of the Association since it was chartered in 1972, and, as of January 1980, was its sole shareholder and sole director. In addition, Dr. Eberstein is now the sole trustee of both plans since Richard Martin was removed as trustee sometime before commencement of this action. Other employees of the Association have been and are participants and beneficiaries under the plans. As of January 1980, assets were approximately $43,000 in the pension plan and $84,000 in the profit sharing plan.[3] Dr. Eberstein's interest in

**2.** Garnishee Citizens National Bank has answered in Civil Action No. 3–80–0489–H and moved for discharge upon determination of the claims to the funds which it holds. In Civil Action No. 3–80–1637–H, an order was entered on February 18, 1981, extending the time for answer for Garnishee E. F. Hutton pending resolution of the related case against Citizens National Bank. On October 26, 1981, the E. F. Hutton case was transferred to this Court and consolidated with Civil Action No. 3–80–0489–H.

**3.** In Civil Action 3–80–0489–H, Garnishee Citizens National Bank indicated in its answer that it was holding funds of $157.64 for the pension plan and $104.17 for the profit sharing plan. The remainder of the assets of the two plans are in stocks and bonds held by E. F. Hutton which are the subject of the garnishment action in Civil Action 3–80–1637–H.

these plans is approximately 80% of their total value. The plans are not yet in pay status and Eberstein has not received any payment or benefits from either of the plans, although he expects to do so in the future.

These garnishment actions are now before the Court on motions for summary judgment filed by Plaintiff CMI and Intervenors Eberstein, et al. The major thrust of the Eberstein motion is that ERISA exempts the assets of the two plans from garnishment by a private judgment creditor and also preempts any state laws in conflict with this provision. In the alternative, Eberstein argues that Texas law precludes garnishment of the plans because they both contain spendthrift provisions.

In response to the claims of the Eberstein intervenors, CMI initially contends that Section 1056(d)(1) applies, if at all, only to pension plans and has no effect on profit sharing plans. On the substantive interpretation of Sections 1056(d)(1) and 1144(a), CMI maintains that ERISA prohibits only voluntary assignments and has no effect on involuntary transfers such as garnishments. In the alternative, if Congress intended to impose such an exemption, CMI's position is that an implicit exception was made for those ERISA plans which were essentially self-settled. In any event, CMI argues that neither Congress nor any governmental agency has constitutional authority to declare a general exemption of private property and any such attempt is void under the Tenth Amendment. Under the controlling Texas law of trusts, furthermore, the "spendthrift" provisions of the two trust instruments are invalid as to the interests of Eberstein since the plans are essentially self-settled trusts.

The substantive legal issues posed by both motions for summary judgment are questions of the statutory construction of ERISA. In interpreting statutes, a court's function "is to construe the language so as to give effect to the intent of Congress." *United States v. Amer. Trucking Ass'ns.*, 310 U.S. 534, 542, 60 S.Ct. 1059, 1063, 84 L.Ed. 1345 (1940). The most persuasive evidence of congressional intent is "the words by which the legislature undertook to give expression to its wishes." *Id.* at 543, 60 S.Ct. at 1063. Although a salutary rule of statutory construction prohibits resort to extrinsic aids when a statute on its face appears to be clear and unambiguous, the Court heeds the Supreme Court's admonition that:

> [W]hen aid to construction of the meaning of words, as used in the statute, is available, there certainly can be no 'rule of law' which forbids its use, however clear the words may appear on 'superficial examination'.

*Id.* at 543–44, 60 S.Ct. at 1063–64; *see also Train v. Colorado Pub. Int. Research Group*, 426 U.S. 1, 96 S.Ct. 1938, 48 L.Ed.2d 434 (1976); *Exxon Corp. v. Train*, 554 F.2d 1310 (5th Cir. 1977). In the difficult task of discerning congressional intent in this case, therefore, the Court will be aided by several tools of statutory construction such as the language of the statute, the regulatory structure which ERISA set in place, and the legislative history of its passage of Congress.[4] With these in mind, the Court will attempt to ascertain congressional intent with regard to commercial garnishment under state law of ERISA pension benefits.

B. *Are Profit Sharing Plans Covered by Section 1056(d)(1) of ERISA?*

The threshold issue which CMI raises is whether 29 U.S.C. § 1056(d)(1) ex-

---

4. The rules of construction are ways of finding out the intent. The actual words used are important but insufficient. The report of congressional committees may give some clue. Prior drafts of the statute may show where meaning was intentionally changed. Bills presented but not passed may have some bearing. Words spoken in debate may now be looked at. Even the conduct of the litigants may be important in that the failure of the government to have acted over a period of time on what it now suggests as the proper interpretation throws light on the common meaning. But it is not easy to find the intent of the legislature.

Levi, *An Introduction to Legal Reasoning*, 15 U.Chi.L.Rev. 501, 520 (1948).

tends to Eberstein's profit sharing plan. The provision states simply:

> Each pension plan shall provide that benefits provided under the plan may not be assigned or alienated.

CMI contends that the statute's use of the term "pension plan" envisions a narrow application to only those retirement plans which are officially denominated as "pension plans". Under the Plaintiff's interpretation, if Congress had intended to apply Section 1056(d)(1) to every kind of plan regulated by ERISA, it would have used a more encompassing term. The Court has concluded, however, that the adoption of the theory urged by the Plaintiff is inconsistent with both the language of the statute and the policies which supported its passage.

Looking first to the definitions employed by the statute, the terms "employee pension benefit plan" and "pension plan" are described as:

> Any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—
>
> (A) provides retirement income to employees, or
>
> (B) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond,
>
> regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan. 29 U.S.C. § 1002(2).

That the definition of a "pension plan" is intended to reach a wide variety of retirement benefit structures is clear from the use of the "any plan, fund or program" language. The only limitation is that any such plan, fund or program "by its express terms" provide for retirement benefits or deferral of income. Although CMI may contend that other reasons motivated the establishment of the two plans by Eberstein, there should be no dispute that the stated purpose of the profit sharing plan is to provide retirement benefits at some point to the participants. Eberstein's profit sharing plan, therefore, would appear to fall within the parameters of a "pension plan" as defined in ERISA.

This conclusion is supported by a review of other language in the statute's definitional section which covers a plan "regardless of the method of calculating" either contributions or benefits under the plan. 29 U.S.C. § 1002(2). The only distinction between more common retirement plans and a profit sharing plan lies in the method by which the annual funding requirements are met. A profit sharing plan would be a "defined contribution plan" as opposed to a "defined benefit plan" or a conventional pension plan. Section 1002(2) makes clear that this distinction is not intended to exclude such a plan from the definition of "pension plan". Sections 34 and 35 of the same definitional sequence of ERISA, furthermore, specifically describe such "defined contribution" and "defined benefit" plans as "pension plans". 29 U.S.C. § 1002(34) and § 1002(35).

The description of the statutes' coverage in the congressional committee reports also buttresses the construction adopted by the Court. In a discussion of the minimum funding requirements for retirement plans, the House Committee on Ways and Means states that "it is inappropriate for profit-sharing and stock bonus plans to be governed by [these standards]," because of the method these plans use to calculate benefits and contributions. H.R.Rep.No.93–807, 93rd Cong., 2d Sess. 3, reprinted in [1974] U.S.Code Cong. & Ad.News 4670, 4756. The clear implication of this discussion of exclusion from certain ERISA requirements is that profit sharing plans are covered by the remaining statutory mandates.

The language of the statute and the explanations provided by Congress of its import, therefore, lead the Court to conclude that the Eberstein profit sharing plan is within the definition of "pension plan" as

that term is utilized in ERISA. Having determined that both plans before the Court are subject to ERISA regulation, the next inquiry is whether the statute provides an exemption from garnishment by a commercial creditor.

### C. Exemption of Pension Benefits under ERISA from Garnishment

The legal question which this case poses is whether, with the enactment of ERISA, state law or federal law governs the enforcement of a creditor's claim by garnishment on the pension benefits of his debtor. As pointed out earlier, the directly relevant federal statutes are 29 U.S.C. §§ 1056(d) and 1144(a), and 26 U.S.C. § 401(a)(13) of the Internal Revenue Code of 1954 (I.R.C.).[5] Under 29 U.S.C. § 1056(d) each covered pension plan must provide that plan benefits may not be "assigned or alienated." This provision does not apply to "any voluntary and revocable assignment of not to exceed 10 percent of any benefit payment." I.R.C. section 401(a)(13) provides that a pension trust will not be a qualified trust for federal income tax purposes unless the plan of which the trust is a part contains essentially the same assignment-prohibition provisions required by Section 1056(d). With exceptions not here relevant, ERISA 29 U.S.C. § 1144 provides that Title I of ERISA, including section 1056(d) thereof, supersedes all State laws that "relate to any employee benefit plan" subject to ERISA.

On February 15, 1978, the Treasury Department issued final regulations interpreting I.R.C. section 401(a)(13).[6] The regulations require tax-qualified pension plans to provide that plan benefits may not be "anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution of other legal or equitable process."[7] Thus far, the Labor Department has apparently not issued any regulations interpreting Sections 1056(d) or 1144(a), although it has such authority under ERISA.

There are two alternative bases upon which this Court could conclude that after the enactment of ERISA, federal law governs the garnishment of pension benefits. The first would be that the assignment-alienation prohibition in sections 1056(d) and I.R.C. section 401(a)(13) creates a federal exemption of covered pension benefits from creditors' claims which supersedes state law on the subject. In the alternative, the Court could determine that, although these sections may not create a per se federal exemption, Congress nevertheless intended that ERISA supersede and preempt state laws governing the enforcement of creditors' claims as applied to pension benefits. Federal courts would be required under this theory to develop federal common law to govern such claims. After a close review of the sparse case law on these points, ERISA and its legislative history, the Court has concluded that ERISA's assignment-alienation prohibition creates a general federal exemption of pension benefits from commercial creditors' claims and preempts otherwise relevant state law. Although there is significant support for the thesis that ERISA preempts state law governing garnishment even if ERISA does not create a federal exemption for such benefits, the Court need not ground its decision on this basis in view of its conclusion that a federal exemption exists.

### 1. Legislative History of ERISA

Neither Section 1056(d) nor I.R.C. section 401(a)(13) mention garnishment in their prohibitions of assignments or alienations of pension benefits. The legislative history is similarly cryptic with only three references to the sections in all the six committee reports prepared during congressional consideration of the statute:

(a) *Other provisions to protect covered employees and their beneficiaries.*—In addition to the minimum participation, vesting and funding standards provided in the bill, your committee has adopted

---

5. Section 401(a)(13) was added to the Internal Revenue Code by ERISA § 1021(c).

6. Treas.Reg. § 1.401(a)–13(b)(1).

7. Treas.Reg. § 1.401(a)–13(d)(1).

a number of specific provisions to protect the rights of employees and beneficiaries under qualified plans.

\* \* \* \* \* \*

Qualified plans must provide that retirement benefits may not be assigned or alienated, except for voluntary and revocable assignments of not more than 10 percent of the benefits. H.R.Rep.No.93–807, 93rd Cong.2d Sess. 3, reprinted in [1974] U.S.Code Cong. & Adm.News 4670, 4695.

(b) *Alienation.*—To further ensure that the employee's accrued benefits are actually available for retirement purposes, the committee bill also contains a provision requiring the plan to provide that benefits may not be assigned or alienated. (Of course, this provision is not intended to prevent the transfer of benefit rights from one qualified plan to another.)

Nevertheless, a plan will be permitted to provide for voluntary and revocable assignments (not to exceed 10 percent of any benefit payment).

\* \* \* \* \* \*

*Id.* at 4734.

(c) *Alienation.*—Under the conference substitute, a plan must provide that benefits under the plan may not be assigned or alienated. However, the plan may provide that after a benefit is in pay status, there may be a voluntary revocable assignment (not to exceed 10 percent of any benefit payment) by an employee which is not for purposes of defraying the administrative costs of the plan. *For purposes of this rule, a garnishment or levy is not to be considered a voluntary assignment.* Vested benefits may be used as collateral for reasonable loans from a plan, where the fiduciary requirements of the law are not violated.

House & Senate Conf.Comm., Conf. Rep. on H.R. 2, Pension Reform, H.R. Rep.No.93–1280, 93d Cong., 2d Sess. 3, reprinted in [1974] U.S.Code Cong. & Adm.News 5038, 5061. (emphasis added).

The legislative language in (c) is relied on by CMI for its position that garnishments are not prohibited by the assignment-alienation language. CMI argues that "this rule" in the underscored sentence of (c) refers only to the rule stated in the first sentence. Under this interpretation, the entire effect of the underscored sentence is to declare that the "assignment or alienation" prohibition refers only to voluntary assignments or alienations and not to garnishments or levies. CMI contends that when Congress has intended to prohibit garnishment and attachments, it has clearly so stated, as in statutes specifically prohibiting garnishment of civil service benefits, 5 U.S.C. § 8346 and veteran benefits, 10 U.S.C. § 1450.

Reported decisions of courts addressing this question are few. The Sixth Circuit, in the only federal decision on point, concurred with CMI's thesis and found "a strong indication that Congress recognized the difference between voluntary and involuntary encroachments on benefit funds and has stated it specifically when both are forbidden." *General Motors v. Buha*, 623 F.2d 455, 460 (6th Cir. 1980). That Court also concluded, however, that ERISA's legislative history was too inconclusive on the issue of whether garnishments are covered by ERISA. In another case, a New York state court reached the conclusion that Congress intended in Section 1056(d) and I.R.C. § 401(a)(13) to prohibit only the voluntary acts of pension plan beneficiaries. *See National Bank of North America v. International Brotherhood of the Electrical Workers*, 419 N.Y.S.2d 127, 69 A.D.2d 679 (N.Y. App.1979).

The emphasized language in (c), however, can also be read as stating that the statutory exception permitting voluntary assignments of 10 percent of each benefit payment does not apply to a garnishment or levy, which obviously are not voluntary assignments. If this latter interpretation is correct, one could infer that the assignment-alienation prohibition itself must apply to involuntary assignments because oth-

erwise it would not be necessary to emphasize that the statutory exception for 10 percent voluntary assignments does not apply to involuntary assignments. In *General Motors v. Buha, supra*, the Sixth Circuit similarly reasoned that:

> Nevertheless, Congress did use the word 'voluntary' in specifying those assignments which qualify for the 10 percent exception in § 1056(d)(2). This can reasonably be read as an indication that the preceding language in § 1056(d)(1) included all encroachments, both voluntary and involuntary.

623 F.2d at 460.

This Court has concluded that the only reasonable reading of both the language of Sections 206(d) and 401(a)(13) and the totality of the legislative history is that the assignment-alienation prohibition extends to involuntary assignments such as garnishments. In the first place, the legislative intent behind the emphasized language in (c) must be read in conjunction with the other portions of the ERISA committee reports. In both segments (a) and (b), it is clear that the provision for voluntary assignment is only an *exception* to the general requirement that retirement benefits not be assigned or alienated. With this background from the House Committee report in mind, the first sentence must be read as including all forms of assignments or alienations. The third sentence of (c), therefore, only serves to make clear that neither garnishments nor levies can be considered "voluntary revocable assignments" to qualify for the exception.

The policies underlying ERISA "to protect interstate commerce and the interests of participants in employee benefit plans and their beneficiaries ...." 29 U.S.C. § 1001(b), compel the same conclusion that garnishments are covered by the assignment-alienation prohibition. Two of the three cited references to legislative history emphasize that the aim of the prohibition is

"to protect covered employees and their beneficiaries" and "[t]o further insure that the employee's accrued benefits are actually available for retirement purposes ...." To allow a commercial creditor to reach the benefits of a pension plan beneficiary would totally destroy the complex structure Congress created to protect these very benefits.

CMI's argument that Congress only intended to protect plan benefits from voluntary acts likewise would emasculate the regulatory scheme imposed by ERISA. Congressional intent is clearly to ensure that retirement benefits are actually available to a plan beneficiary *and his/her dependents.* It is this explicit assumption which has underpinned the determination by a number of courts that, although ERISA generally prohibits garnishments, an exception exists where the purpose of the garnishment is to enforce the duty of maintenance and support owed by a plan beneficiary to a spouse or dependents.[8] Protection of both a beneficiary *and* the family will likewise be threatened if retirement benefits are subject to involuntary assignments such as garnishments. This policy may, of course, work inequities in some situations where a debtor may evade a legitimate obligation. Congress has already made this judgment, however, and deemed it necessary to protect the integrity of the entire retirement system even at the expense of some injustice. It is not for this Court to try to readjust the scales.

■ CMI contends that, even if a federal exemption of ERISA pension benefits is generally found, any such interpretation should not apply where, as here, the trusts are established by a professional association for the benefit of the sole director and shareholder. Specifically, CMI argues that the Texas Professional Association Act, Tex.Rev.Civ.Stat.Ann. art. 1528f, was passed only to allow such professionals to obtain full tax benefits for contributions to

---

**8.** *See, e. g., Operating Engineers Local No. 428 Pension Trust Fund v. Zamborsky*, 650 F.2d 196 (9th Cir. 1981); *American Telephone & Telegraph Co. v. Merry*, 592 F.2d 118 (2d Cir. 1979); *Senco of Florida, Inc. v. Clark*, 473 F.Supp. 902 (M.D.Fla.1979); *Cartledge v. Miller*, 457 F.Supp. 1146 (S.D.N.Y.1978); *Cody v. Riecker*, 454 F.Supp. 22 (E.D.N.Y.1978), affirmed, 594 F.2d 314 (2d Cir. 1979).

qualified employee benefit plans. Applying a federal exemption from garnishment to these plans would, CMI posits, create a loophole in both Texas and Federal law. This argument, however, ignores the plain language of the Texas statute. Section 2 of the Professional Association Act specifically provides that an association may be formed by "one or more persons duly licensed to practice a profession . . . ." The Texas statute, thus, plainly envisions a situation such as the instant case with only one professional member. CMI concedes, furthermore, that one of the reasons underlying passage of the Act was specifically to allow such professionals to take advantage of tax benefits afforded for pension plans. In addition, ERISA also intended to eliminate the discrimination in retirement laws against the self-employed.[9] The Court cannot agree with CMI's argument that the result worked by exempting the Eberstein plans from garnishment was not contemplated by either Congress or the Texas Legislature.

## 2. *Treasury Department Regulations*

■ The Treasury Department has also interpreted both ERISA and the legislative history language to extend the assignment-alienation prohibition to involuntary assignments in its regulations under I.R.C. section 401(a)(13) which provide in part:

> (b) No assignment or alienation.—(1) General rule. Under ·section 401(a)(13), a trust will not be qualified unless the plan of which the trust is a part provides that benefits provided under plan may not be anticipated, assigned (either at law or in equity), alienated or subject to attachment, garnishment, levy, execution or other legal or equitable process. 26 C.F.R. § 1.401(a)–13(b)(1) (1979).

Consistent with the statute, an exception to the assignment-alienation prohibition is made for a participant's voluntary and revocable assignment, after he/she has begun to receive plan benefits of not more than 10 percent of each benefit payment.[10]

CMI opposes any attempt to place reliance on the Treasury regulation on the grounds that it merely states the tax consequences of the failure of a plan to provide such an exemption and does not create an exemption itself. In addition, CMI argues that the Treasury Department has no authority to declare which, if any, exemptions are to exist between private litigants and any attempt to do so is beyond the agency's statutory authority.

In order to determine the weight which should be accorded the Treasury Department's interpretation, it is necessary first to assess the role which that agency plays in the enforcement structure of ERISA. As enacted, ERISA consisted of four titles, two of which have no bearing on the issue in this case. Title I, relevant to this case, contains provisions for the protection of employee benefit rights which are codified in Title 29 of the United States Code. Title II contains amendments to the Internal Revenue code regarding taxation of pension plans, which are codified in Title 26 of the Code. These tax provisions of Title II embody requirements for pension plans that must be satisfied to make the plan eligible for certain favorable tax treatment. The tax terms in Title II are closely analogous to, and almost identical to, the employee benefit provisions for pension plans set forth in Title I. Thus, Section 1056(d) in Title 29 incorporates the same assignment-alienation prohibition reflected in Section 401(a)(13) in Internal Revenue Code contained in Title 26.

---

**9.** *See* Senate Rep.No.93–127, 93d Cong., 2d Sess. 3, reprinted in [1974] U.S.Code Cong. & Adm.News 4838, 4900; Senate Rep.No.93–383, 93d Cong., 2d Sess. 3, reprinted in [1974] U.S. Code Cong. & Adm.News 4890.

**10.** Treas.Reg. § 1.401(a)–13(d)(1). An exception is made for an assignment to defray plan administration costs. The regulations also provide that the assignment-alienation prohibition shall not preclude the enforcement of a federal tax levy or the collection by the United States of a judgment for unpaid taxes. Treas.Reg. § 1.401(a)–(13)(b)(2).

The identity between Title I and Title II of ERISA is important because Congress specifically delegated to the Treasury Department, rather than to the Labor Department, authority to issue regulations concerning participation, vesting and funding standards. Congress further provided that the regulations issued by Treasury would apply as well to the analogous employee benefit sections of Title I in these areas.[11] All of Section 1056(d) is within this area designated by Congress as subject to regulations by the Secretary of the Treasury. Moreover, Congress required that any violation of Title I must be referred by the Secretary of Labor to the Treasury Department. That the relevant sections of Title I and II were drawn in identical fashion, therefore, seems clearly designed to ensure uniform results in their interpretation.

The Court therefore cannot agree with CMI's contention that Congress envisioned only a limited role for the Internal Revenue Service and Treasury Department in the overall scheme of ERISA. CMI's support for this argument relies on a description of the role which the IRS played *prior* to the enactment of ERISA. In fact, Congress anticipated that the enforcement of ERISA would "rely primarily on the tax laws to secure needed improvements in pension and related plans." Senate Report No. 93–383, U.S.Code Cong. & Admin. News 1974, p. 4890, *supra.* The statute was designed to provide "tax incentives ... for the purpose of encouraging the establishment of plans which contain socially desirable provisions." *Id.*

In light of the clear delegation to the Treasury Department of rulemaking power respecting participation standards, Congress' clear directive that Treasury regulations shall govern the employee benefit provisions of ERISA, and the pivotal role which Congress envisioned for Treasury in the statute's enforcement, Reg. § 1.401(a)–13 must provide significant support for the determination that pension plan benefits are not subject to commercial garnishment.[12] The Sixth Circuit in *General Motors v. Buha, supra,* relied on the Treasury Department regulation to find that ERISA exempts retirement benefits from garnishment by a commercial creditor. Although this Court does not place dispositive weight on the agency's regulation, it does conclude that the Treasury's interpretation of ERISA's requirements provides underpinning for the similar conclusion reached by the Court.

---

**11.** 29 U.S.C. § 1202(c) provides:

 (c) Regulations prescribed by the Secretary of the Treasury under sections 410(a), 411 and 412 of Title 26 (relating to minimum participation standards, minimum vesting standards, and minimum funding standards, respectively) shall also apply to the minimum participation, vesting and funding standards set forth in parts 2 and 3 of subtitle B of subchapter 1 of this chapter [which include § 206(a)]. Except as otherwise expressly provided in this Act, the Secretary of Labor shall not prescribe other regulations under such parts, or apply the regulations prescribed by the Secretary of the Treasury under sections 410(a), 411, 412 of Title 26 and applicable to the minimum participation, vesting and funding standards under such parts in a manner inconsistent with the way such regulations apply under sections 410(a), 411 and 412 of Title 26.

**12.** *See, e. g., Batterton v. Francis,* 432 U.S. 416, 97 S.Ct. 2399, 53 L.Ed.2d 448 (1977); 2 K.C. Davis, *Administrative Law Treatise,* s7.8 at 36–37 (1979). When an agency regulation is issued pursuant to a clear delegation of rulemaking authority, the scope of review utilized by a court is more restricted than for review of interpretative rules. In *Batterton v. Francis, supra,* the Supreme Court described the standard of review for legislative rules:

 In a situation of this kind, Congress entrusts to the Secretary, rather than to the Courts, the primary responsibility for interpreting the statutory term .... The regulation at issue in this case is therefore entitled to more than mere deference or weight. It can be set aside only if the Secretary exceeded his statutory authority or if the regulation is 'arbitrary, capricious or an abuse of discretion or otherwise not in accordance with law'.

432 U.S. at 424–26, 97 S.Ct. at 2404–06 (footnotes and citations omitted).

In *General Motors v. Buha,* the Sixth Circuit followed this analysis and determined that the Treasury regulation "had to be followed unless it was issued in excess of the statutory authority of the Secretary" or was 'arbitrary, capricious or an abuse of discretion' .... 623 F.2d at 462–63.

### 3. *Preemption of State Law Under ERISA*

■ Section 1144(a) of ERISA provides that the statute supersedes "any and all state laws insofar as they may now or hereafter relate to any [covered] employee benefit plan." 29 U.S.C. § 1144(a). The term "state law" includes "all laws, decisions, rules, regulations or other state action having the effect of law." 29 U.S.C. § 1144(c)(1). The term "state" includes any political subdivision or agency or instrumentality thereof "which purports to regulate, directly or indirectly, the terms and conditions of [covered] employee benefit plans." 29 U.S.C. § 1144(c)(2). There are explicit exceptions to the general preemption rule for state laws regulating insurance, banking or securities and for generally applicable state criminal laws. 29 U.S.C. § 1144(b)(2), (4).

The legislative history of ERISA indicates that Congress, while attempting to formulate legislation concerning employee benefit plans, devoted considerable attention to the question of preemption. A more limited preemption provision in early drafts of ERISA was ultimately rejected in favor of the more sweeping language found in Section 1144(a). The conference report indicates that the committee intended that preemption be just as broad as the statutory language suggests:

> Under the substitute, the provisions of Title I are to supersede all State laws that relate to any employee benefit plan that is established by an employer engaged in or affecting interstate commerce or by an employee organization that represents employees engaged in or affecting interstate commerce.

House & Senate Conf. Rep., *supra.* Statements made in the debates which preceded the enactment of the conference committee's version of the bill also demonstrate that Congress both comprehended the change and intended the statute to occupy the entire field of employee benefit plan regulation. Senator Harrison Williams, Jr., Chairman of the Senate Committee on Labor and Public Welfare, emphasized the broad scope of Section 1144(a):

> It should be stressed that with the narrow exceptions specified in the bill, the substantive and enforcement provisions of the conference substitute are intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans. This principle is intended to apply in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law.

Williams statement, *supra*, n.1 at 5188.

The initial inquiry in application of the preemption provision is whether state garnishment laws as relied on by a commercial creditor "relate to" employee benefit plans so as to trigger Section 1144(a)'s preclusion. It has been argued that, in spite of the literal language of the section and the debates, Congress did not intend that all state and local laws and rules would not be given effect to the extent that they apply in *any* way to employee plans. Thus, in decisions denying ERISA preemption other than by application of a statutory exception, state laws regarding community property law and civil rights have been upheld under Section 1144(a).[13] In this case, however, the Court is faced with no need to read the statute's preemption provision in an expansive fashion. The Court has concluded that ERISA does create a federal exemption for pension benefits and thus even under a narrow reading of ERISA's preemption provision, state law governing commercial gar-

---

13. *See, e. g., American Telephone & Telegraph v. Merry*, 592 F.2d 118 (2d Cir. 1979) (ERISA does not preempt state court judgment ordering garnishment of pension income to satisfy a divorce obligation.); *Stone v. Stone*, 450 F.Supp. 919 (N.D.Cal.1978) *affirmed*, 632 F.2d 740 (9th Cir. 1980), *cert. denied*, —— U.S. ——, 101 S.Ct. 3158, 69 L.Ed.2d 1004 (1981) (ERISA does not preempt community property law as it relates to pension benefits or bar payments of benefits to a former spouse of the participant); *Bucyrus-Erie Co. v. Dept. of Industry, Labor and Human Rel.*, 599 F.2d 205 (7th Cir. 1979), *cert. denied*, 444 U.S. 1031, 100 S.Ct. 701, 62 L.Ed.2d 667 (1980) (ERISA does not preempt state fair employment law).

nishment of pension benefits would necessarily be preempted.

### D. *Tenth Amendment*

■ The final argument urged by CMI raises issues of constitutional implications. If ERISA does create an exemption for pension benefits from garnishment under state law by a commercial creditor which supersedes state law, CMI asserts that the statute is an unconstitutional exercise of power under the Commerce Clause. The constitutionality of federal legislation is determined by a two-part test. Congress must (1) have a rational basis to find that the regulated activity affects interstate commerce, and (2) select means of regulation reasonable and appropriate to achieve that end. *Heart of Atlanta Motel v. United States*, 379 U.S. 241, 258–59, 85 S.Ct. 348, 358, 13 L.Ed.2d 258 (1964). *See also McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 421, 4 L.Ed. 579 (1819).

■ CMI essentially contends that the second part of this test has been breached and that any ERISA exemption from garnishment is unreasonable and inappropriate in that the Tenth Amendment to the Constitution precludes such a substitution of national for state regulation and that such action impinges on a state's interest in enforcing judgments.[14] The theory urged by CMI initially posits the question whether an otherwise valid exercise of Congressional power under the Commerce Clause is subject to limitation under the Tenth Amendment. The answer is little disputed. Courts have repeatedly held that the Tenth Amendment imposes no limitation on Congress' application of the commerce power to private activity. As the Supreme Court stated in *Case v. Bowles*, 327 U.S. 92, 66 S.Ct. 438, 90 L.Ed. 552 (1946) [citations omitted]:

> [T]he Tenth Amendment 'does not operate as a limitation upon the powers, express or implied, delegated to the national government.'

'Where as here, Congress has enacted legislation authorized by its granted powers and where at the same time, a State has a conflicting law which but for the Congressional Act would be valid, the Constitution marks the course for courts to follow. Article VI provides that 'The Constitution and the Laws of the United States' * * * made in pursuance thereof * * * shall be the supreme Law of the Land * * *.

327 U.S. at 102–103, 66 S.Ct. at 443. In *Oklahoma v. Atkinson*, 313 U.S. 508, 61 S.Ct. 1050, 85 L.Ed.2d 1487 (1941) [citations omitted], furthermore, the Supreme Court concluded that:

> The Tenth Amendment does not deprive 'the national government of authority to resort to all means for the exercise of a granted power which are appropriate and plainly adapted to the permitted end' . . . . Since the construction of this dam and reservoir is a valid exercise by Congress of its commerce power, there is no interference with the sovereignty of the state . . . .

313 U.S. at 534, 61 S.Ct. at 1063.

■ It is clear, however, that the Tenth Amendment imposes substantive limitations on Congress' power under the Tenth Amendment when it enacts requirements which are directed at a state:

> While the Tenth Amendment has been characterized as a 'truism', stating merely that 'all is retained which has not been surrendered,' *United States v. Darby*, 312 U.S. 100, 124 [61 S.Ct. 451, 462, 85 L.Ed. 609] (1941), it is not without significance. The Amendment expressly declares the constitutional policy that Congress may not exercise power in a fashion that impairs the States' integrity or their ability to function effectively in a federal system.

*National League of Cities v. Usery*, 426 U.S. 833, 842–43, 96 S.Ct. 2465, 2470, 49 L.Ed.2d 245 (1976) *quoting Fry v. United States*, 421 U.S. 542, 95 S.Ct. 1792, 44 L.Ed.2d 363

---

**14.** The Tenth Amendment states:

> The powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people.

(1975). Federal legislation which significantly impairs a State's ability to perform functions essential to its existence as a State, therefore, transgresses the limits of the Tenth Amendment. The Court in *National League of Cities*, however, drew a very clear distinction between "the authority of Congress to enact laws regulating individual business necessarily subject to the dual sovereignty of the Nation and of the State in which they reside" and "a similar exercise of congressional authority directed, not to private citizens, but to the States as States". *Id.* at 845, 96 S.Ct. at 2471. CMI's argument would require this Court to hold that state garnishment laws involve an essential and traditional function of state government, which this court need not and cannot do. All that is before the Court is the validity of a federal exemption of pension plan funds from garnishment by a commercial creditor. Unlike *National League of Cities* application of this exemption will not withdraw from the States the authority to garnish other assets of the debtor or to satisfy its judgments in other fashions. This is a far cry from a congressional action which would impair either "the States' integrity or their ability to function effectively in a federal system."

■ Where Congress has legitimately concluded that employee benefit plans so affect interstate commerce as to warrant federal intervention, and has reasonably determined that the preemption of state garnishment laws as they relate to commercial creditors is necessary to accomplish its legislative purposes, therefore, the Tenth Amendment poses no bar to ERISA's operation.

Accordingly, the Court has concluded that the Eberstein profit-sharing and pension plans are not subject to garnishment by CMI. Plaintiff CMI's motion for summary judgment is DENIED. The motion of the Eberstein intervenors for summary judgment is GRANTED and Judgment will be entered accordingly.

SO ORDERED.