VICTOR GOTBAUM, as Trustee of the District Council 37 Benefits Fund Trust, et al., Respondents, and EDWARD OSTROWSKI, as Trustee and Chairman of the Board of Trustees of the Uniformed Sanitationmen's Association Retirees' Welfare Fund and Uniformed Sanitationmen's Association Compensation Accrual Fund, et al., Intervenors-Respondents-Appellants, v ALBERT B. LEWIS, as Superintendent of the Insurance Department of the State of New York, Appellant-Respondent.

First Department, August 8, 1985

APPEARANCES OF COUNSEL

*Aven Rennie* of counsel (*Frederick Mehlman, Richard G. Liskov* and *O. Peter Sherwood* with him on the brief; *Robert Abrams, Attorney-General,* attorney), for appellant-respondent.

*Bertram Perkel* of counsel (*Michael B. Golden, Kenneth K. Fisher, Jeffrey Kreisberg, Edward Tessler* and *Stephen F. Gordon* with him on the brief; *Hartman & Craven* and *Mirkin & Gordon, P. C.,* attorneys), for respondents and intervenors-respondents-appellants.

## OPINION OF THE COURT

ELLERIN, J.

Plaintiffs-respondents, the trustees of various public employee union welfare funds, seek a declaratory judgment that defendant-appellant, Superintendent of the Insurance Department of the State of New York, has no regulatory jurisdiction under Insurance Law article III-A over their funds. Article III-A invests the Insurance Department with supervisory powers of registration and regulation of employee welfare funds in order to "protect the rights of employees and their families" (Insurance Law § 37).

The "employee welfare funds" subject to regulation under the article are defined by section 37-a as "any trust fund or other fund established or maintained jointly by one or more employers together with one or more labor organizations". Plaintiffs' funds are established by contributions from the employer and are managed by the trustees, all of whom are representatives of the union. Plaintiffs claim that these funds are not within the contemplation of section 37-a because they are "unilaterally administered" by the union trustees and are, therefore, exempt from regulation.

In support of their position, plaintiffs point to the fact that the Department of Insurance itself for 26 years declined to assert jurisdiction over these funds on that basis and that the Department supported the introduction of legislation in 1980 and again

in 1981 seeking amendment of Insurance Law § 37-a to expressly include reference to public employee welfare funds funded with government moneys and administered solely by labor organizations. Although such legislation was not enacted, the Department notified the plaintiff funds (and others) in 1982 that they were required to register under article III-A. The instant declaratory judgment action followed, with Special Term granting summary judgment to plaintiffs based upon the history of nonenforcement.

Notwithstanding the prior contrary interpretation accorded the statute by the Department of Insurance, a review of the legislative history of the statute, its policy and purpose, and the plain meaning of the language of the statute, all indicate that plaintiffs' funds are intended to be subject to the Insurance Department's regulatory jurisdiction and that the determination of Special Term holding the funds exempt from such regulation should be reversed.

Insurance Law article III-A had its genesis in the aftermath of the disclosures of irregularities in the management of many union welfare funds which came to light following the murder of union leader Thomas Lewis in 1953. An ensuing investigation of some 162 union welfare and benefit funds resulted in the issuance of a report by the Department of Insurance which found cause to criticize a substantial minority of union-administered and jointly administered welfare plans and which concluded that serious abuses including graft, kickbacks and misuse of funds, all to the detriment of beneficiaries, were symptomatic of conditions to be found in a significant number of such plans.[1]

In response to such findings, the Legislature, in 1955, passed a bill imposing strict regulation on funds "established or maintained as a contractual obligation". The bill was vetoed by Governor Harriman for its failure to embrace all types of plans and, in 1956, the Governor proposed legislation providing for the regulation of all employee welfare funds. While the Legislature declined to adopt the Governor's proposal, later in the session it considered and enacted the "Mitchell Bill", current Insurance Law article III-A. Significantly, the bill, as originally proposed, encompassed only funds "managed or operated" jointly, but prior to passage the definition was changed to funds "established or maintained jointly". Similar language was also included in Banking Law article II-A, § 61.

---

1. This report focused on plans funded by employers pursuant to collective bargaining agreements and administered by the union alone or jointly by employer-union trustees.

Each of the parties selectively points to particular statements and memoranda submitted at the time of the statute's enactment as support for its interpretation of the meaning of the words "established or maintained jointly". Those statements, however, must be evaluated in the context of the situation actually prevailing which gave rise to the need for the law at the time in question. In that regard, it must be noted that some years earlier the Federally enacted Taft-Hartley Law had provided that all union welfare funds, established after January 1, 1946, to which employers contributed, were required to be jointly administered by both union and employer representatives. That law did not, however, cover employee welfare plans that were unilaterally funded *and* administered solely by either employers or unions. Thus, in 1956 when the statute in issue was enacted most employee welfare plans were, in fact, jointly administered as required by the Taft-Hartley Act and the great majority of the remaining plans were unilaterally funded and administered by employers, or were employer funded-union administered plans established prior to the Federal statute. Parenthetically, it may be noted that none of the plaintiff-respondents' welfare funds were yet in existence in 1956.

While the Insurance Department's report of 1954 had focused exclusively on funds that were "union-administered" or "jointly administered" and detailed the extent of abuses found in the administration of such funds, a further report was issued by the Department in 1956 with respect to welfare plans unilaterally funded and administered by employers. That report indicated that the Department's investigation had uncovered no specific abuses with respect to such employer funded-administered plans but that the potential for abuse existed which warranted regulation of those types of funds as well as of those that had been earlier investigated.

It is in this setting that we must view the import of various statements directed to the ambit of newly enacted section 37-a.

We find that then Superintendent of Insurance, Leffert Holz, in his memorandum to the Governor, recommended approval of the bill despite its limited coverage of only "jointly administered and union welfare and pension plans" and despite its deficiency in failing "to cover employer sponsored and operated plans". While he noted that "such plans have not been subject to the kind of dishonesty and pilfering found in jointly administered and union plans", he manifested concern that the "supervision of jointly-administered *and* union welfare and pension plans" (emphasis added) would inevitably raise "class" issues as to why

employer sponsored plans providing comparable benefits were exempt.

The 1956 New York State Legislative Annual similarly noted criticism of the law because it was not sufficiently comprehensive to include employer administered plans.

The memorandum of the New York State Federation of Labor recommended a veto of the Mitchell Bill because its "coverage is deliberately limited to collectively bargained welfare funds" giving a distorted view of those funds and in no way protecting "employees covered by employer self-established or maintained funds from such abuses".

Senator Mitchell, during the debate on the bill, indicated that it was intended to cover the types of abuses that had been included in the Insurance Department report with respect to jointly administered and union-administered funds.

The Superintendent of the Banking Department, in his letter recommending approval of the statute, took note of the change in the wording of the bill from "jointly managed or operated", which would have limited coverage to funds with "a joint board of administrators who were in control of the operation of the funds", to the revised language "making the bill applicable to jointly 'established or maintained' funds" by which the sponsors *"were apparently seeking to broaden its scope"* (emphasis added).

Prior to issuing formal instructions for the registration of employee welfare funds under the legislation, the Superintendent of Insurance sought an opinion from the Attorney-General clarifying the precise meaning of the words "established or maintained" which the Superintendent deemed ambiguous. The opinion rendered by the Attorney-General cannot be considered a model of clarity and in some respects may be said to have created more confusion than clarification. The opinion at the outset observes that the Governor's memorandum and the debate of the bill "are clear on the point that this legislation was not intended to apply to employee welfare funds which are unilaterally administered" and "that the bill dealt only with 'jointly administered' funds" (1956 Opns Atty Gen 187, 188). The Attorney-General thereafter goes on to state that "[t]he word 'established' should, in my opinion, be interpreted, to mean 'to create', 'bring into being', 'constitute', 'found' or 'to set up' * * * The word 'maintained' should be interpreted to mean 'to support', 'bear the expense of', 'carry on', 'operate', 'manage' or 'to maintain as an established institution'" (1956 Opns Atty Gen 187, 189). While further stating (*ibid.*) that "[t]he law * * * relates to *actual* establishment or *actual* maintenance and not to

an agreement which may have been entered into by 'one or more employers together with one or more labor organizations', but which requires only one or the other of these parties to establish and maintain the fund", the language ultimately suggested by the Attorney-General for use in the proposed Insurance Department instructions is as follows: " 'A fund will be regarded as having been jointly "established" if the fund itself was or is actually created, brought into being, constituted, founded, or set up by joint or bilateral action of one or more employers and one or more labor organizations, whether directly or through trustees as defined in the law. A fund, even though not jointly "established" will be regarded as jointly "maintained", if it is actually carried on, receives financial contributions from, is operated or managed as an established institution through joint or bilateral action of one or more employers and one or more labor organizations, whether directly or through trustees as defined in the law.' " (1956 Opns Atty Gen 187, 190.)

Notwithstanding the definitions provided, the actual language of the statute, and the prior history as to what abuses were intended to be addressed by the statute, it appears that the Insurance Department adopted the view that its regulatory authority under the statute did not extend to "unilaterally administered" plans. Whether this was due to the use of that terminology in the Governor's memorandum and its repetition in the Attorney-General's opinion or by reason of a strain on its resources due to the large number of jointly administered plans which were subject to its regulatory authority or for some other reason, be it political or pragmatic, is not clear. What is clear, however, is that the Department of Insurance made no attempt to regulate plaintiffs' welfare funds from the time they first came into existence, in 1966, and thereafter through 1979, when the last of the funds was created pursuant to collective bargaining agreements between the city and the various unions representing government employees. Indeed, in 1964, the Department expressly rejected an application for registration by a welfare fund similar in format to those of the plaintiffs.

In 1974, with the passage by Congress of the comprehensive Employee Retirement Income Security Act (ERISA), the Insurance Department's jurisdiction over most employee welfare funds was preempted by Federal regulation. ERISA, however, expressly exempted from its coverage funds established by contributions from the Federal and State Governments, or subdivisions thereof, such as those of the plaintiffs herein.

While the advent of ERISA resulted in the State Insurance Department's diminishment of attention to welfare funds, the

spectre of irregularities in such funds rose once again in the late 1970's. A departmental investigation disclosed a multimillion dollar fraud involving one of the municipal union welfare funds. Thereafter, the New York State Commission of Investigation conducted a detailed inquiry into that situation.

Prior to the issuance of a report by the Commission of Investigation, the Superintendent of Insurance, in both 1980 and again in early 1981, sponsored identical bills in the Legislature to amend section 37-a so as to expressly include "funds financed by any 'government' or 'public employer'". (1980 Assembly Int 10815, Senate Int 10034; 1981 Assembly Int 5766, Senate Int 4601; 1982 Assembly Int 5766, Senate Int 4601A.)[2] Such amendment was not adopted.

In March 1981, the Commission of Investigation issued a lengthy report, entitled "A Trust Betrayed". This report not only documented past abuses throughout the 1970's, but it also criticized the lack of attention by the regulatory agencies to municipal union employee welfare funds and warned of the great potential for abuse of such funds, although implicitly acknowledging the high standards of performance by union trustees in many such funds including those of the plaintiff UFT fund. While the report does make reference to the fact that the Insurance Department may not have jurisdiction of "funds that are unilaterally administered", in what may be termed a latter-day version of the fable of the Emperor's clothes, the report upon a literal reading of the language actually used in section 37-a concludes that "the 1956 Attorney General's opinion seems inapplicable to funds", such as are here in issue, which are, "clearly 'established' by contract" between the union and the city and which are "clearly 'maintained' by the City's yearly contribution".

Upon reviewing the Commission of Investigation report, the Insurance Department determined that despite its previous contrary interpretation, the plain meaning of the language of section 37-a did, in fact, authorize its regulation of the plaintiffs' (and similar) funds and in 1982 it advised the various funds that they were required to register.

The court below at Special Term based its granting of summary judgment in favor of plaintiffs on the practical construction given the statute by the Department of Insurance during the 26 years prior to its change in policy and upon some of the language in the original Attorney-General's opinion. However,

---

**2.** The bill was carried over by the Legislature in 1982, although not introduced by the Department.

as Special Term aptly observed, it is the court which is the final arbiter of the proper construction of a statute (McKinney's Cons Laws of NY, Book 1, Statutes, § 129 [b]) and no agency or officer can make a statute applicable or inapplicable by erroneously construing it, nor may a statute be enlarged beyond the generally accepted meaning of the terms thereof by the opinion or action of executive or administrative officers (*Matter of Evans v Newman,* 100 Misc 2d 207, *affd* 71 AD2d 240, *affd* 49 NY2d 904; *Matter of Nelson v New York State Civ. Serv. Commn.,* 96 AD2d 132).

Plaintiffs-respondents argue that the legislative history of this statute should be ignored "because the statute is unambiguous and resort to legislative history is therefore unnecessary". We agree that the statute is indeed unambiguous and it is precisely because its language clearly and plainly provides for regulation of any fund "established *or* maintained jointly" that we conclude that plaintiffs' funds come within the scope of its regulation.

It would appear that much of the confusion engendered here stems from the use of the language "unilaterally administered" in the Governor's memorandum issued upon approval of the statute and the subsequent reiteration of that term by the Attorney-General. A review of the history leading up to the enactment of the statute and particularly the Governor's own emphasis on the need for *all* types of funds being covered by legislation, not only those referred to in the Insurance Department's 1954 report, would indicate that the term "unilaterally administered" funds was intended, albeit perhaps inartistically and imprecisely phrased, as a synonym for the funds unilaterally established and administered primarily by employers. This is supported by the various statements and memoranda, including that of the then Superintendent of Insurance, which decried the fact that only unilateral plans by employers were excluded. (*Cf. also, People v Automobile Transporters Welfare Fund,* 17 AD2d 448, 455.) In an effort to address this problem, the Governor, in 1957 and again in 1958, unsuccessfully submitted bills "to bring under regulation those funds which are unilaterally administered".

Simply stated, the position taken by plaintiffs is that a fund which is "unilaterally administered" cannot be construed to be one that is "established or maintained jointly". The difficulty with this position is that the statute does not speak of "administered". It is true that the wording of the statute as initially proposed would have limited its scope to funds that were jointly

"managed or operated", a phrase that would be synonymous with "administered". (*See, e.g., Sprinzen v Supreme Ct. of State of N. J.,* 478 F Supp 722 [SDNY].) However, that is not the language which was finally adopted and which is, of course, controlling — i.e., fund "established or maintained jointly". Significantly, plaintiffs have made no effort to demonstrate, as indeed would be impossible, that their respective funds were unilaterally established *and* have been unilaterally maintained. It is such type of "unilateral" fund that is exempt from regulation under the plain and unambiguous language of section 37-a and under the original Attorney-General's opinion (1956 Opns Atty Gen 187, 188).

The ultimate decision by the Legislature to expand the scope of the statute by deleting the original words "managed or operated jointly" and substituting instead funds "established or maintained jointly" clearly demonstrates the intention not to limit coverage to only jointly administered funds but rather to expand the reach of the statute.

Such conclusion is bolstered by an examination of the legislative intent and purpose. The scandals of the early 1950's focused on the abuses in funds managed solely by unions or by joint union-employer trustees. The widespread irregularities found in such welfare funds were not found in those that were solely employer-funded and operated. "As a general rule, the legislative intent with which statutes are enacted is to be collected from the context, from the occasion and necessity of the law, from the mischief felt, and from the objects and remedy in view." (McKinney's Cons Laws of NY, Book 1, Statutes § 95.) "[S]tatutes should be construed to carry out the objects sought to be accomplished by them". (*Matter of Blatnicky v Ciancimino,* 1 AD2d 383, 388, *affd* 2 NY2d 943.) Article III-A was designed to address abuses in employee welfare plans and only that group of plans in which no abuses were found were intended to be excluded, that is, the truly unilateral plans — i.e., those both funded and maintained exclusively by either an employer or a union, with the overwhelming majority of such plans being employer plans.

The very language of the statute confirms this interpretation. The plain meaning of the words allows that in the disjunctive a fund may be "established *or* maintained jointly". That the funds here in issue fall within this description is clear. They do so in both respects, although only one would be necessary. The term "established", in its meaning "to create", "constitute", "set up" and the like, would include both the initial providing of moneys

(by the employer) and the concomitant providing of a mechanism to utilize those moneys for employee welfare purposes by way of the execution and implementation of an appropriate trust agreement (by the particular union). The joint nature of the undertaking is emphasized by the fact that if the employer were merely to provide moneys but no action were taken by the union to channel such moneys unto a "welfare plan" format, no fund would, in fact, be created or set up. Alternatively, if the union were to create an extensive blueprint or plan for a welfare fund but no funds were forthcoming from the employer for such purpose, the "plan" would be wholly without vitality and nothing more than an empty shell. It is only the coalescence of the joint efforts and acts of both the employer and the union that result in the actual establishment or creation of the fund. Similarly, it is the concurrence of the joint activities of both which enable the plan to be "maintained" as that term was interpreted by the Attorney-General in its meanings of "to support" or "bear the expense of" (i.e., the employers contributions) and to "operate", "manage" or "to maintain as an established institution" (i.e., the management and administrative activities of the union trustees including the distribution of benefits). It is the joint participation of the employer and the union in the workings of each of the funds, both with respect to their establishment and maintenance, which renders such funds subject to the provisions of section 37-a. While not the situation that is here involved, it may be observed that, since the statute speaks in the disjunctive, the unilateral establishment of a fund by an employer and the subsequent exclusive maintaining of such fund by the union would also appear to be sufficient to meet the joint requirement of the statute.

While the long-term practical construction of the statute by the Department of Insurance, the agency charged with the administration of the statute, exempting plaintiffs' funds from regulation, is entitled to great weight and may not be ignored, such interpretation is not necessarily binding on the court and the court will not be bound by an erroneous interpretation of law. (See, Ferraiolo v O'Dwyer, 302 NY 371, 376; Matter of Nelson v New York State Civ. Serv. Commn., 96 AD2d 132, 134, supra.) A court should not hide behind the ruling of an administrative officer or agency in order to escape the duty to interpret a statute, since the court is the final arbiter as to the proper construction. (See, Meyer v Zimmer, 197 Misc 653, on rearg 197 Misc 894.) It is important to note that despite the long history of Insurance Law article III-A, this litigation is the first time that a court has been asked to rule on the construction of section 37-a

with respect to the question here in issue and, once presented, it is the court's duty to interpret the statute in light of the legislative intent and the plain meaning of the language used.

It cannot be said that the alleged "change in policy" by the Department in this situation was unreasonable or arbitrary. An administrative agency's own view of what is in the public interest may change (*see, Greater Boston Tel. Corp. v Federal Communications Commn.*, 444 F2d 841, 852) and an agency charged with furtherance of the public interest is not bound by rigid adherence to precedent. (*See, New Castle County Airport Commn. v Civil Aeronautics Bd.*, 371 F2d 733, 735.) This remedial statute must be liberally construed to carry out its beneficial purposes (McKinney's Cons Laws of NY, Book 1, Statutes §§ 54, 321), especially in light of the Superintendent's broad statutory authority to regulate fraudulent practices to protect the beneficiaries of welfare funds. (*Ostrer v Schenck*, 41 NY2d 782, 789.)

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Alfred M. Ascione, J.), entered on May 8, 1984, granting plaintiffs' motion for summary judgment should be modified, on the law, without costs, the motion denied and defendant's cross motion for summary judgment should be granted and a declaration made that the Insurance Department of the State of New York has regulatory jurisdiction over the plaintiffs' and intervenor-plaintiffs' funds under Insurance Law article III-A, § 37-a and otherwise affirmed.

BLOOM, J. (dissenting). Plaintiffs and intervenor-plaintiffs (collectively, plaintiffs) are trustees of employee welfare funds established by unions of municipal employees under collective agreements with the City of New York or with agencies and authorities which perform functions normally performed by the city. The action is against the State Superintendent of Insurance and seeks a declaration that plaintiffs are not bound by the reporting and other provisions of Insurance Law, article III-A.[1]

Plaintiffs comprise part of the 114 employee welfare funds[2] created by the city, its agencies and authorities and the munici-

---

1. The counterpart statute involving corporate trustees of employee welfare funds (Banking Law, art II-A, § 60 *et seq.*) is not here involved.

2. Although it plays no part in this proceeding it is worthy of mention that these funds performed a major function in enabling the city to stave off bankruptcy during the fiscal crisis which commenced *circa* 1975. By agreement with the Municipal Assistance Corporation (Big Mac) they purchased large blocks of Big Mac bonds when the city's bonds were not saleable on the open market. While these investments proved profitable to the funds, they were a godsend to the city.

pal unions with which they have collective bargaining relationships. The agreements provide for a lump-sum payment by the employers into each of the funds, based upon the number of employees involved. From that point onward, the employers have no further relationship with these funds other than periodic reports made to the city Comptroller pursuant to a regulation adopted by him. The funds are administered solely by trustees designated by the unions involved, who have adopted the trust indentures pursuant to which payments from the funds are made.

In 1956, as a result of investigations prompted largely by the murder in 1953 of Tommy Lewis, a leader of the Building Services Employees International Union, then Governor Harriman proposed to the Legislature the act which, after substantial amendment, ultimately became Insurance Law article III-A. That article authorized the regulation and supervision of employee welfare funds. It defined such funds as "any trust fund or other fund established or maintained jointly by one or more employers together with one or more labor organizations, whether directly or through trustees, to provide employee benefits, by the purchase of insurance or annuity contracts or otherwise" (Insurance Law § 37-a [1]). Employee benefits are defined as "including, but not limited to, medical, surgical or hospital care or benefits, benefits in the event of sickness, accident, disability or death, benefits in the event of unemployment, or retirement benefits" (§ 37-a [2]). Every such fund is required to register with the Superintendent of Insurance (§ 37-b [1]) and to file annual reports with the Superintendent (§ 37-g). The Superintendent is authorized to conduct examinations of each employee benefit fund "as often as he deems necessary, and he shall do so at least once in every five years" (§ 37-c [1]).

Despite the disjunctive language contained in the definitions of "employee welfare fund" it was made evident during the debate on the measure that its passage or defeat hinged on whether it would subject unilaterally administered funds, particularly those administered solely by employers, to its jurisdiction. That the act ultimately adopted was limited solely to funds administered both by employers or their representatives and unions is made abundantly clear in the Governor's memorandum of approval. In it he referred to his special message to the Legislature of February 22, 1956 (1956 NY Legis Ann, at 429) and added (at 482):

"It should be clearly understood by the people of our State that there have been abuses not only in jointly administered funds

but also in funds which are unilaterally administered by employers.[3] Regulation and supervision should embrace both the unilaterally administered funds and the jointly administered funds. It is a gross neglect of responsibility that the Legislature has failed to include unilaterally administered funds in the measure.

"The bill passed by the Legislature deals only with jointly administered funds. On the other hand, the bill recommended by me covered all funds".

Nevertheless, he approved the bill as a step necessary to the comprehensive legislation required to protect the employees entitled to benefits under all welfare funds (1956 NY Legis Ann, at 482, 483).

The Department of Insurance, apparently troubled by the disjunctive use of the words "established or maintained" in the statutory definition of "employee welfare funds" (§ 37-a [1]), requested an interpretation from the Attorney-General. The Attorney-General noted in his opinion that, in the preparation thereof, he had had a transcript of the debate in the Senate when the measure was before it as well as a copy of the Governor's memorandum of approval. Both, he stated "are clear on the point that this legislation was not intended to apply to employee welfare funds which are unilaterally administered by a labor organization or organizations or by an employer or employers". He continued:

"In my opinion, an employee welfare fund should be regarded as 'established' within the meaning of and subject to the law as it is written if the fund itself was or is actually created, brought into being, constituted, founded or set up by joint or bilateral action of one or more employers and one or more labor organizations. It is my further opinion that a fund should be regarded as 'maintained' within the meaning of and subject to the law as it is written if the fund is actually carried on, receives financial contributions from, is operated or managed as an established institution through joint or bilateral action of one or more employers and one or more labor organizations.

"The law, in my opinion, relates to *actual* establishment or *actual* maintenance and not to an agreement which may have been entered into by 'one or more employers together with one or more labor organizations', but which requires only one or the other of these parties to establish and maintain the fund. It is for

3.  In passing, it is worthy of note that Governor Harriman made no specific reference to funds such as those here in question, which are administered solely by union representatives.

this reason that I have used the words 'joint or bilateral action' in the above discussion and have placed the emphasis on *actual* joint or bilateral establishment and on *actual* joint or bilateral maintenance. These constructions are consistent with the intention of the Legislature as expressed in the debate and with the Governor's understanding of the legislation when he approved it (see McKinney's 'Statutes' §§ 2, 92 and 95).

"In accordance with the above opinion, I suggest that the language of your proposed instructions, describing funds which are jointly established or jointly maintained, should read as follows:

" 'A fund will be regarded as having been jointly "established" if the fund itself was or is actually created, brought into being, constituted, founded, or set up by joint or bilateral action of one or more employers and one or more labor organizations, whether directly or through trustees as defined in the law. A fund, even though not jointly "established" will be regarded as jointly "maintained", if it is actually carried on, receives financial contributions from, is operated or managed as an established institution through joint or bilateral action of one or more employers and one or more labor organizations, whether directly or through trustees as defined in the law.' " (1956 Opns Atty Gen 187-190.)

Undaunted by what he conceived to be the frustration, in 1956, of his plan for all-embracing legislation regulating both bilaterally and unilaterally administered employee pension plans, Governor Harriman returned to do battle both in his 1957 and 1958 annual messages to the Legislature. On both occasions, he made reference to the failure to embody in Insurance Law article III-A and Banking Law article II-A, regulation and supervision of funds administered solely by unions or solely by employers (1957 NY Legis Ann, at 379; 1958 NY Legis Ann, at 348). The language of his 1958 message is singularly pertinent. After noting the improvements in the administration of the funds regulated, he went on to say (at 357): "Yet, a significant gap in the law remains to be filled. It is estimated that approximately 3,500 funds administered unilaterally either by employers or labor organizations remain outside the scrutiny of the law. These funds have assets of approximately $12 billion (more than 90 per cent of all funds and plan assets) and six million covered employees. They are growing rapidly. Those held by banks alone increased by $1.35 billion during the year, bringing the total held by them to nearly $10 billion. I *urge once again that this gap be sealed.*" (Emphasis added.)

On each occasion the messages were supplemented by measures which failed of enactment.

On November 12, 1964, the Health and Welfare Fund of the Patrolmen's Benevolent Association of the City of New York filed a registration statement with the Department of Insurance, presumptively pursuant to Insurance Law § 37-b (1). Although that fund is not a party to this action it was created pursuant to collective agreement between the city and the PBA in the same manner as were the plaintiffs and is administered in the same fashion. An interoffice communication in the Department of Insurance, dated December 10, 1964, noted "that this is a unilateral fund and should not have been registered with this Department". Apparently, the PBA was so notified for, by letter dated December 16, 1965, it requested that its registration be canceled. By letter dated December 21, 1965, it was notified that it had been "deregistered".

In 1974, the Congress enacted the Employee Retirement Income Security Act ([ERISA] 29 USC ch 18, § 1001 *et seq.*).[4] Prior to the commencement of the 1980 legislative session the Insurance Department addressed a memorandum to Governor's counsel (now a Justice of the Appellate Division, Second Department) Richard Brown setting forth one of its legislative proposals. The purpose of the proposal was: "[t]o extend regulatory authority of the Insurance and Banking Departments to public employee welfare funds which are administered unilaterally by labor organizations as to which there has been no pre-emption by the Federal Employee Retirement Income Security Act of 1974".

The memorandum went on to note: "The State, however, does not have jurisdiction over any unilaterally administered employee welfare fund under the provisions of Article 3-A of the Insurance Law or Article 2-A of the Banking Law. Neither the Federal nor the State government supervises governmental employee welfare funds unilaterally administered by one or more labor unions". The proposed measure annexed to the

---

**4.** Much argument has been spent on the preemptive effect of 29 USC § 1144. In certain areas, notably regulation and supervision of employee benefit plans, that section has been construed to grant primary jurisdiction to the Federal authorities. (*Standard Oil Co. v Agsalud,* 633 F2d 760, *affd* 454 US 801.) In other areas, the doctrine of preemption has not been applied (*Delta Air Lines v Kramarsky,* 650 F2d 1287, *affd in part* 463 US 85; *National Bank v International Brotherhood of Elec. Workers,* 69 AD2d 679, *appeal dismissed* 48 NY2d 752). Since we do not deem it germane to our conclusion, we do not deal with it further other than to note that it is questionable as to whether the plaintiff funds are "governmental plans" within the meaning of the exemption contained in 29 USC § 1003 (b) (1).

memorandum broadened the term "employee welfare funds" as defined in Insurance Law § 37-a to encompass any trust fund or other fund financed by any government or public employer.

The bill proposed by the Insurance Department failed of passage.

In 1981 the Superintendent of Insurance submitted his annual report for the year ending December 31, 1980. In it he again noted: "[t]he State * * * does not have jurisdiction over any unilaterally administered employee welfare fund under provisions of Article 3-A of the Insurance Law or Article 2-A of the Banking Law". Again, he recommended adoption of the amendment rejected at the 1980 legislative session. Supplementing the request of the Superintendent of Insurance was a report of the Commission of Investigation, dated March 1981 entitled "A TRUST BETRAYED: FRAUD, BREACH OF FIDUCIARY DUTY, AND WASTE AT THE TEAMSTERS LOCAL 237 WELFARE FUND". The report went on to depict how one William Wallach, a long-time friend and relative by marriage of the chairman of the board of trustees of the Local 237 Welfare Fund, had been selected as the fund's insurance broker and consultant. It added that, acting together with Calvin Winick, another insurance broker, "Wallach defrauded the fund of over $3 million from 1972 through 1980".

Despite the urgings of the Insurance Department and the report of the Commission of Investigation the Legislature rejected the proposed amendment. Following defeat of the proposed amendment by the Legislature, the Superintendent, by letter dated May 10, 1982, sent to all of the funds financed by the city or other public employers, including these plaintiffs, demanded that they register in accordance with Insurance Law § 37-b, under threat of criminal and civil sanctions.

For an unbroken period of 26 years, everyone in authority recognized that Insurance Law article III-A had no application to plaintiffs and to welfare funds unilaterally administered by other municipal unions. The Senate so indicated in its debate on the measure. The Governor complained about what he conceived to be the deficiency in his memorandum of approval. The Attorney-General rendered his opinion indicating that municipal unions were not within the ambit of the legislation. In 1957 and again in 1958, the Governor sought, unsuccessfully, to have article III-A amended to include unilaterally administered funds. The PBA, which registered erroneously, was deregistered by the Insurance Department because it was not subject to article III-A. The Insurance Department in 1980 submitted a memorandum to Governor's counsel acknowledging the inappli-

cability of article III-A to plaintiffs and other municipal unions. In that year it submitted legislation to broaden its powers and to submit plaintiffs and other funds unilaterally administered by municipal unions to its regulatory and supervisory power. When that endeavor failed, it submitted its annual report for the year ending December 31, 1980 emphasizing its lack of power and the need therefor. In 1981, it again submitted the legislation rejected in 1980. This time its plea was supplemented by the report of the State Commission of Investigation. When this final assault failed, it sought by administrative fiat to accomplish that which it had failed to accomplish by the orderly processes of government.

I am aware that the mere passage of time will not preclude defendant from urging a new interpretation of the statute. As a governmental agency, estoppel is not available against it in the exercise of its governmental function (*D'Angelo v Triborough Bridge & Tunnel Auth.,* 65 NY2d 714; *Matter of Daleview Nursing Home v Axelrod,* 62 NY2d 30; *Granada Bldgs. v City of Kingston,* 58 NY2d 705; *Matter of Hamptons Hosp. & Med. Center v Moore,* 52 NY2d 88). However, we are convinced that defendant's initial reading and interpretation of the statute was the correct one. In the matter before us, the municipal authorities neither established nor maintained the funds. Their sole function was and is to finance them. Once that is done, their task is complete, save as the city Comptroller may seek to insure that these disbursements by the municipal authorities have reached their intended beneficiaries. The funds are administered unilaterally. The fact that the funds may not be regulated or supervised under ERISA or Insurance Law article III-A does not create a vacuum into which defendant may step in the absence of legislative authority.

Accordingly, I am in agreement with the conclusion reached by Special Term and would affirm.

MURPHY, P. J., SULLIVAN and MILONAS, JJ., concur with ELLERIN, J.; BLOOM, J., dissents in an opinion.

Order and judgment (one paper), Supreme Court, New York County, entered on May 8, 1984, modified, on the law, without costs and without disbursements, the motion denied and defendant's cross motion for summary judgment granted and a declaration made that the Insurance Department of the State of New York has regulatory jurisdiction over the plaintiffs' and intervenor-plaintiffs' funds under Insurance Law article III-A, § 37-a, and otherwise affirmed.